UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PAMELA L. DIBBLE,

                    Plaintiff,

          -against-                                        6:15-CV-0716 (LEK)

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.
_____

## DECISION and ORDER

## I.      INTRODUCTION

          This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have filed

briefs.  Dkt. Nos. 13 ("Plaintiff's Brief"); 14 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is vacated and remanded for further

proceedings consistent with this Decision and Order.

## II.     BACKGROUND

          Plaintiff Pamela L. Dibble ("Plaintiff") is currently fifty-six years old and claims that her

medical condition bars her from all gainful work activity.  Dkt. No. 12 ("Record") at 38, 76-77.[1]

Specifically, Plaintiff complains of pain in her temples, face, neck, eye, and tooth, attributes this

pain to atypical trigeminal neuralgia, and further complains of  migraine headaches, degenerative

disc disease of the cervical spine, anxiety, depression, hypertension, and acute tissue disorder, with a

disability onset date of January 28, 2013.  R. at 20-21, 206.

_____
          [1] Citations to the Record use the pagination assigned by the SSA.

Plaintiff has a high school education and was employed between 2000 and April 2013 as a bank teller, a head teller, a manager of a financial institution, a convenience store manager, a claims clerk, and an insurance sales agent. R. at 242-44. At Plaintiff's most recent job, as a MetLife insurance sales agent, Plaintiff took short-term disability leave from January 28, 2013, through the second week of April 2013. R. at 20, 45. Plaintiff worked from April 2013 through July 2, 2013, but missed work several times, including for an entire week. R. at 20, 37, 45, 61-62. Plaintiff stopped working on July 3, 2013 when she experienced a panic attack while driving to work. R. at 37, 45. Plaintiff was terminated from MetLife after she was unable to return to work on July 3, 2013. R. at 45-46.

**A. Procedural History**

On October 15, 2013, Plaintiff filed an application for disability insurance and Supplemental Security Income ("SSI") benefits, alleging disability with an onset date of January 28, 2013. R. at 173-78. The application was denied on January 8, 2014. R. at 76. Plaintiff timely filed a Request for Hearing, which was held by video conference in Syracuse, New York, on July 22, 2014. R. at 18. The Appeals Council denied Plaintiff's request for review of the ALJ's decision on April 9, 2015. R. at 1. Plaintiff filed a timely appeal on June 11, 2015. Dkt. No. 1 ("Complaint").

**B. Medical Evidence**

From January 27 through January 28, 2013, Plaintiff was admitted to Rome Medical Hospital's emergency department under the care of Huberto Perez, M.D., with severe headaches and cervical pain. R. at 384. Plaintiff claimed the headaches and cervical pain had been present for four weeks. Id. Plaintiff reported that, since November 2012, she also had neck and jaw pain. R. at 387. The hospital administered MRI, MRA, and CT scans that showed significant multilevel

2

degenerative change and herniated discs in Plaintiff's cervical spine.  R. at 262, 280.  Accordingly, Plaintiff was diagnosed on January 30, 2013, with cervicalgia.  R. at 383.  Plaintiff told Dr. Perez that the medication for migraines and the muscle relaxers given to her by the hospital were ineffective against her headaches, facial pain, and tooth pain.  R. at 382.

To follow up the hospital stay, Plaintiff consulted with one of her treating physicians, Dr. Erick C. Bulawa, from Rome Medical Group on January 31, 2013.  R. at 379.  Plaintiff discussed stabbing pain and discomfort in the left temple and trigeminal sensory systems.  Id.  Plaintiff indicated  that hydrocodone was only effective for short periods of time.  Id.  Rome Medical Hospital subsequently prescribed gabapentin to treat Plaintiff's pain.  Id.  During the January 31, 2013 appointment, Dr. Bulawa suspected that Plaintiff had trigeminal neuralgia and instructed Plaintiff to take two weeks off of work.  R. at 330, 380.

Two weeks later, on February 14, 2013, Plaintiff again followed up with Dr. Bulawa.  R. at 368.  Plaintiff indicated feeling "still quite uncomfortable," despite her daily use of Tegretol extended release, her recently doubled daily dosage of neurontin, and her daily use of six to seven tablets of hydrocodone.  Id.  Dr. Bulawa noted that Plaintiff continued to miss work and was on short-term disability.  Id.  Plaintiff's prescription of neurontin was increased to 300 milligrams, three times a day.  R. at 370.  Plaintiff was also switched from hydrocodone to Percocet.  Id.  Treatment notes indicated that Dr. Bulawa wanted to refer Plaintiff to a neurologist, a pain management expert, and a neurosurgeon to guide his treatment of this "disabling disease."  Id.

Plaintiff visited another treating physician, Dr. Bulawa, on March 6, 2013, to discuss her suspected trigeminal neuralgia.  R. at 536, 538.  Dr. Bulawa noted that Plaintiff was "actually looking better."  R. at 536.  Plaintiff expressed she decreased her Percocet intake from twelve to six

3

tablets daily.  Id.  Dr. Bulawa noted Plaintiff as "tolerating" 300 milligrams of neurontin, and that she was additionally taking carbamazepine twice daily.  Id.  In response, Dr. Bulawa increased Plaintiff's neurontin prescription by one hundred milligrams and referred Plaintiff to a pain management specialist, Pierre Herard, M.D.  R. at 536, 538.  Plaintiff told Dr. Bulawa she would like to rule out Lyme disease.  R. at 538.

The next day, March 7, 2013, was Plaintiff's initial consultation with Dr. Herard.  R. at 530-33.  Plaintiff discussed progressive facial, eye, and tooth pain, all of which was present since October 2012.  R. at 530.  Plaintiff expressed that the carbamazepine mitigated the pain so that it was "no longer shock-like" but more of a "dull acute" pain.  Id.  However, Plaintiff stated that the pain would still wake her up at night.  Id.  Plaintiff reported that the pain at its worst was a ten out of ten.  Id.  Treatment notes indicated that Plaintiff's trigeminal neuralgia was currently well-controlled with medication decreasing from a ten out of ten to a two out of ten.  R. at 532-33.  Plaintiff also told Dr. Herard that the pain was exacerbated by brushing her teeth, going out in cold weather, and wearing her glasses.  R. at 530.  Plaintiff described using hot towels and heating pads to combat the pain.  Id.  During the visit, Plaintiff also complained of joint pain, cold intolerance, headaches, and unsteadiness.  R. at 531.  Plaintiff was diagnosed by Dr. Herard with neuralgia, TMJ syndrome, cervicalgia, and trigeminal neuralgia.  R. at 532.  Dr. Herard additionally made reference to multilevel degenerative change in Plaintiff's cervical spine and Plaintiff's herniated discs.  Id.  Plaintiff and Dr. Herard discussed various forms of treatment, including surgery, and Dr. Herard suggested a follow-up appointment for April 27, 2013.  R. at 533.

Plaintiff was referred to neurologist Glady Jacob, M.D., by Dr. Francis.  R. at 370.  On March 15, 2013, Plaintiff presented symptoms of occasional tenderness and dizziness.  R. at 528.

Plaintiff indicated that she was tapering off of oxycodone and asked Dr. Jacob about tapering off other medication. R. at 529. Dr. Jacob advised Plaintiff not to taper off the neurontin or carbamazepine. Id. Dr. Jacob also informed Plaintiff she "may not be able to discontinue medication." Id. Treatment notes show Plaintiff's Lyme disease test results were negative. Id. Finally, Dr. Jacob confirmed Dr. Francis's and Dr. Herard's diagnosis of trigeminal neuralgia. R. at 529.

Dr. Jacob referred Plaintiff to Slocum-Dickson Group, where Plaintiff saw rheumatologist Ute Dreiner, M.D., on March 21, 2013, concerning a positive antinuclear antibody ("ANA") blood test. R. at 290. Plaintiff also discussed her facial, tooth, and eye pain and trigeminal neuralgia with Dr. Dreiner. Id. Plaintiff's general complaints included headaches, fatigue, and problems sleeping. Id. Dr. Dreiner noted that Plaintiff was ANA positive and had trigeminal neuralgia. R. at 293. Plaintiff reported back to Dr. Dreiner to follow up with blood work on March 28, 2013. R. at 287. At the follow up, Dr. Dreiner additionally assessed abnormal antibody titers. R at. 288. From the results, Dr. Dreiner diagnosed Plaintiff with connective tissue disorder but noted that Plaintiff was relatively asymptomatic. Id.

On March 29, 2013, Plaintiff saw Eric M. Deshaies, M.D., of Neurosurgical Associates of Central New York. R. at 317-18. Plaintiff reported a dull ache in her teeth, sinuses, and around her eyes. R. at 317. Plaintiff admitted the pain was not constant and that she currently was not in pain. Id. Plaintiff expressed concern that the headset use and stress of her job at MetLife precipitated the first attack. Id. Dr. Deshaies agreed with Plaintiff's diagnosis of trigeminal neuralgia. R. at 318. Plaintiff and Dr. Deshaies discussed treatments, including surgery, gamma knife, glycerol rhizotomy,

and medical management.  Id.  Dr. Deshaies and Plaintiff decided medical management was currently the best option.  Id.

Dr. Bulawa saw Plaintiff again on April 1, 2013.  R. at 356.  Dr. Bulawa discussed rheumatology results with Plaintiff, including the connective tissue disease and its possible relation to trigeminal neuralgia.  Id.  Plaintiff indicated she weaned off her Percocet, but Dr. Bulawa advised continuation of Tegretol and increased Plaintiff's neurontin by 100 milligrams.  R. at 358.

By May 2, 2013, Plaintiff had discontinued narcotic painkillers and was "relatively pain free" with the assistance of her other medication.  R. at 352.  On May 6, 2013, Plaintiff was seen by RPA Shane Angleton at Rome Medical Group.  R. at 350-51.  Plaintiff denied a headache, but complained of very high blood pressure, dizziness, and feeling light headed.  R. at 350.  Hypertension was noted in Plaintiff's history and added to Plaintiff's diagnoses.  Id.

Plaintiff followed up with Dr. Jacob on May 20, 2015.  R. at 301-02.  Dr. Jacob's treatment notes indicate Plaintiff was off narcotic painkillers but still on carbamazepine for pain.  R. at 301.  Plaintiff expressed a desire to taper off medication, but Dr. Jacob opined that Plaintiff should wait until after dental work.  R. at 302.  Dr. Jacob's stated Plaintiff was "has done well" with the notable exception of two episodes of facial pain earlier in the week.  Id.

Later that month, on May 31, 2013, Plaintiff followed up with Dr. Bulawa.  R. at 344.  Plaintiff's blood pressure was still elevated.  R. at 344-45.  Dr. Bulawa noted the stress of work "may be aggravating the blood pressure and trigeminal neuralgia."  R. at 345.  Plaintiff's cervicalgia was also noted to "be exacerbated by stress [and] anxiety."  R. at 347.  Dr. Bulawa stated Plaintiff "will not be allowed to wean down on her [n]eurontin medication" until after dental work and teeth

extractions.  R. at 346.  Additionally, Plaintiff was diagnosed by Dr. Bulawa with generalized anxiety disorder and was prescribed Xanax.  R. at 347.

On July 12, 2013, Plaintiff visited Dr. Bulawa and reported that she developed anxiety and panic attacks.  R. at 338-39.  Plaintiff stated the stress exacerbated her headaches.  R. at 339.  Dr. Bulawa commented that left TMJ may be contributing to Plaintiff's headaches.  R. at 340.  Plaintiff was instructed to continue citalopram and Xanax for her anxiety.  R. at 341.

Plaintiff followed up on anxiety concerns with Dr. Bulawa on August 16, 2013.  R. at 334.  Dr. Bulawa noted that Plaintiff had intermittent balance concerns exacerbated by driving and motion.  R. at 335.  Plaintiff also began to take Percocet again for her pain.  R. at 336.  Dr. Bulawa referred Plaintiff to David Gordon, M.D., an otolaryngologist, for her dizziness and balance issues.  R. at 337.

Plaintiff visited neurologist Dr. Gregory Cummings on August 30, 2013, where she discussed the pain on the left side of her face.  R. at 688-89.  Plaintiff explained that her pain was hypothesized by an unnamed physician to be her wisdom teeth, but those had been removed  two weeks prior.  R. at 688.  Plaintiff also noted that a neurosurgeon postulated that the pain was "atypical trigeminal neuralgia."  Id.  Plaintiff's history was declared by Dr. Cummings to be inconsistent with "classic" trigeminal neuralgia, and he diagnosed Plaintiff with facial pain.  R. at 689.  Dr. Cummings claimed Plaintiff had no prior history of TMJ in her records.  Id.  Dr. Cummings further noted that Plaintiff was on relatively low dosages of multiple medications and subsequently increased her dosage of Neurontin by 200 milligrams.  Id.

Plaintiff returned to Dr. Bulawa on September 13, 2013.  R. at 488-91.  Despite still being on Percocet, carbamazepine, and neurontin, Dr. Bulawa noted that Plaintiff's trigeminal neuralgia seemed "to be getting worse."  R. at 489.  Plaintiff claimed "worsening" and "increasing symptoms"

and "needing a higher dose of medication." Id. Dr. Bulawa commented that "[s]urprisingly her work is not giving her disability." Id. Plaintiff's increasing anxiety and irritability were noted by Dr. Bulawa as secondary to resolving Plaintiff's "chronic pain condition." Id. At this time, Plaintiff continued to take Xanax but was mostly stabilized on citalopram. R. at 491. Dr. Bulawa also noted that Plaintiff still suffered from occasional symptoms of dizziness and giddiness. Id. Objective notes from the appointment stated that Plaintiff appeared unwell, weak, uncomfortable, and worried. R. at 490. Dr. Bulawa instructed Plaintiff to follow through with the neurosurgical consultation and possible definitive interventional procedures. Id. Dr. Bulawa further discussed limiting oxycodone to improve Plaintiff's sleep quality. Id. Finally, Dr. Bulawa instructed Plaintiff to remain out of work for three months, and stated he would write a letter documenting her level of disability. Id.

Plaintiff was referred by Dr. Francis to the Ear, Nose & Throat Specialists of Oneida County for evaluation concerning a potential syncope diagnosis. R. at 312-14. At Plaintiff's evaluation, on September 30, 2013, Plaintiff presented a persistent left ear sensation and left facial pain. R. at 312. Plaintiff complained of feeling off balance and occasional dizziness. Id. The ear sensation was suspected to be related to TMJ or type II trigeminal neuralgia and Plaintiff was referred to physical therapy. R. at 314.

Plaintiff attended Oneida Healthcare Center under the referral of Catherine Docous, M.D., on October 7, 2013, to initiate physical therapy. R. at 699-702. Plaintiff presented with intermittent pain in her left neck, temple, and face, which on the day of the October 7, 2013 visit was rated an eight out of ten. R. at 701. Plaintiff emphasized that the pain worsened with stress, chewing, and talking on the phone. Id. Dr. Docous's notes made reference to diagnostic images showing a bulging disc in Plaintiff's neck. Id. Dr. Docous also noted that Plaintiff showed a "forward head"

8

and "protracted shoulder." Id. Dr. Docous's October 7, 2013 assessment included tightness along the cervical spine, tenderness at the left temple, and a decreased range of motion in Plaintiff's neck and jaw. R. at 702.

A week later, on October 14, 2013, Plaintiff returned to Dr. Docous to continue physical therapy. R. at 699. Her notes indicated that Plaintiff "felt good" during the appointment. Id. However, when Plaintiff returned to Dr. Docous on October 16, 2013, Plaintiff complained that she developed a headache after her October 14, 2013 appointment. R. at 700. Plaintiff additionally complained of a headache during her October 16, 2013 appointment, which began the previous night and was still present that morning. Id.

Plaintiff followed up with Dr. Deshaies on October 18, 2013. R. at 315-16. Plaintiff reported her normal dull ache around her teeth, sinuses, and eyes as well as a "burning pain" on the left side of her face. Id. Dr. Deshieas agreed with the multiple diagnoses of trigeminal neuralgia and discussed possible gamma knife treatment and referral to pain management. R. at 316. Dr. Deshaies also noted that Plaintiff had anxiety and depression. R. at 315.

In terms of her physical therapy, on October 28, 2013, Plaintiff reported to Dr. Docous that her neck seemed a little better overall. R. at 698. Plaintiff stated that she really did not see much difference in her facial pain since coming to physical therapy. Id.

On November 12, 2013, Dr. Francis completed a Medical Source Statement of Ability to Do Work-Related Activities. R. at 705-06. Dr. Francis indicated that Plaintiff had facial pain, neck pain, trigeminal neuralgia, and disc herniation. R. at 705. Dr. Francis supported his clinical assessment by noting that multiple neurologists confirmed Plaintiff's facial pain was consistent with trigeminal neuralgia. R. at 706. Dr. Francis opined that Plaintiff could sit with normal breaks, for

9

zero to two hours during an eight hour work day, could stand with normal breaks for four hours of an eight hour work day, and could only occasionally lift, carry, push or pull ten or twenty pounds. R. at 705. Dr. Francis further opined that Plaintiff could only occasionally reach and perform jobs with gross and fine manipulation, and that she could only occasionally focus or concentrate. R. at 705-06. The doctor indicated that Plaintiff required environmental limitations, including avoiding extreme temperatures, noise, humidity, stress, and excessive talking. R. at 706. According to the report, Plaintiff would need to be accommodated with unscheduled breaks of five minutes every fifteen minutes, and would likely be absent two days a month. Id. Dr. Francis also cautioned that the medication side effect could cause anxiety, lack of concentration, confusion, and dizziness. Id.

Plaintiff visited Walter Hall, M.D., of Neurosurgical Association of Central New York, on December 2, 2013, for an initial consult. R. at 483. Dr. Hall diagnosed Plaintiff with trigeminal neuralgia. Id. It was decided Plaintiff's facial pain was currently in remission; however, Dr. Hall discussed the gamma knife treatment with Plaintiff at length. Id.

Plaintiff visited Jacqueline Santoro, Ph.D., on December 19, 2013, to undergo a consultative psychiatric evaluation. R. at 408-12. Dr. Santoro indicated that Plaintiff had the following symptoms: difficulty sleeping, weight loss from lack of appetite, and anxiety related symptoms including palpitations, dizziness, breathing difficulties, trembling, choking sensations, and heavy feelings in her chest. R. at 409. Plaintiff said that since January 2013, she had experienced dysphoria, crying spells, hopelessness, irritability, worthlessness, low self-esteem and social withdrawal, short term memory loss, long-term memory loss, disorientation, and sequencing difficulties. Id. Plaintiff stated that her physician instructed her not to drive. Id. Plaintiff reported being able to dress, bathe, groom, do laundry, shop, and manage money. R. at 411. Plaintiff

10

clarified that she struggled with cooking and general cleaning, and that her husband mostly does the cleaning.  Id.  Plaintiff told Dr. Santoro her relationships are strained with her family, but admitted she had one friend who visited often.  Id.  Plaintiff said generally she spent most of her days watching television and being antsy.  Id.  Dr. Santoro opined that the results of the examination appeared to be "consistent with psychiatric problems that may significant[ly] interfere with [the] ability to function on a daily basis."  Id.  Dr. Santoro also believed Plaintiff required assistance to manage funds due to her attention disturbance.  R. at 412.

Plaintiff was admitted to Rome Memorial Hospital on January 17, 2014, for the chief complaint of acute loose stools, feeling flush, tightness in her shoulders, burning in her left arm, chest pains, and upper respiratory tract infection symptoms.  R. at 590, 724.  The admission notes reported Plaintiff's past medical history as including trigeminal neuralgia, hypertension, and anxiety/depression disorder.  R. at 590.  The emergency room's notes indicated that Plaintiff was otherwise "an active individual."  Id.

Plaintiff returned to Dr. Francis on February 11, 2014, and reported that, even with medication, her trigeminal neuralgia pain was uncontrolled.  R. at 629-30.  Plaintiff requested to followup locally with pain management.  R. at 629.  Plaintiff also presented with anxiety and blurry vision.  R. at 630.  Plaintiff was concerned that her blurry vision was related to her medication.  Id.

Plaintiff followed up with an MRI with Dr. Francis on March 13, 2014.  R. at 721.  Plaintiff expressed a history of fainting three or four weeks prior.  Id.  Plaintiff further complained of fainting, headaches, and dizziness for the two weeks leading up to the visit.  Id.

Dr. Francis referred Plaintiff to Adirondack Pain Management Center on March 21, 2014.  R. at 606-09.  Plaintiff described her facial pain as constant and moderate to severe, though improving

with opioid and nonopioid medication.  R. at 606.  Plaintiff indicated that the pain was exacerbated by chewing, cold exposure, and talking.  Id.  Plaintiff additionally described her neck pain as a mild dull ache in both sides of her neck, shoulder, and back.  Id.  Plaintiff admitted her back pain was relieved by physical therapy and transcutaneous electrical nerve stimulation ("TENS") therapy.  Id.  Plaintiff further contended that her anti-anxiety agents made her extremely lethargic and that she fell asleep while eating.  Id.

Plaintiff visited Oneida Healthcare Rehabilitation and Wellness Center for additional physical therapy on April 2, 2014.  R. at 692.  Plaintiff reported neck pain, chronic pain for over a year, an inability to sit, being  unable to do housework without pain, and unable to sleep well without pain medication.  Id.

On April 14, 2014, Dr. Francis noted sleeping issues and mild trigeminal neuralgia exacerbation, which Plaintiff stated might be seasonal.  R. at 625-26.  Dr. Francis stated that Plaintiff's trigeminal neuralgia otherwise appeared well controlled.  Id.

In an intake with Robert Sharpe, M.D., on May 5, 2015, Plaintiff was diagnosed with depression, anxiety, and adjustment disorders.  R. at 655-57.  Dr. Sharpe based his opinion on Plaintiff's symptoms including: depressed mood, anger, difficulty sleeping, disruption of thought process, irritability, obsession, and panic attacks.  R. at 655.  Dr. Sharpe indicated that Plaintiff's symptoms had been present for more than a year.  Id.

On June 20, 2014, Charlene Emertio, LCSW-R, a counselor from Sacred Heart Healing Center, who Plaintiff has been seeing weekly since October 2013, submitted a report outlining symptoms and reports of daily living activities.  R. at 704.  Overall, Plaintiff complained of sleep issues, her mind racing, lack of appetite, lack of concentration, rapid talking, struggling with

relaxation, memory issues, headaches, fatigue, tension, crying, and dizziness. R. at 704. Plaintiff also claimed difficulty doing daily activities and driving. Id. Plaintiff submitted that, while she was able to do dishes and some cooking, her husband did the laundry and other household chores. Id. Plaintiff also stated that she had fallen asleep at the wheel of her car and had passed out at least four times since February 2014. Id.

Plaintiff was seen by Anwar Wassel, M.D., of Pulmonary and Sleep Medicine, about sleep issues on July 14, 2014. R. at 718-20. Plaintiff explained falling asleep while driving and reported several syncopal episodes in the past six months. R. at 718. Plaintiff stated her last syncopal episode was the preceding Thursday. Id. Dr. Wassel noted the multiple medications Plaintiff used for chronic pain and mental health. Id. Dr. Wassel diagnosed Plaintiff with obstructive sleep apnea and insomnia. R. at 720. An overnight polysomnographic study was discussed and scheduled. Id.

Plaintiff followed up with Dr. Jacob on July 15, 2014, where she reported multiple incidents of "passing out" since February. R. at 727. Plaintiff described passing out while eating, while driving, and near her furnace. Id. Plaintiff additionally reported increasing neck pain, bipolar disease, and depression. Id. Dr. Jacob diagnosed Plaintiff with "Syncope & Collapse" and "Spondylosis Cervical w/Myelopathy," and noted multilevel degenerative change. R. at 728. Dr. Jacobs instructed Plaintiff not to drive. Id.

Dr. Jacob ordered a Doppler ultrasound attended by Dr. Francis on July 17, 2014. R. at 716. There was found to be mild plaque within the carotid bifurcation, but "[n]o evidence of significant flow restriction" was identified. Id. Dr. Jacob's notes indicated Plaintiff's history of syncope. Id.

On January 6, 2014, M. Totin ("Totin"), the state agency medical consultant, concluded that Plaintiff had the ability to pull, lift, or carry twenty pounds occasionally and ten pounds frequently.

R at 84. Totin further concluded that Plaintiff could stand, sit, and walk for about six hours in an eight hour workday, and had no postural, manipulative, visual, or communicate limitations. Id. Totin imposed environmental limitations including avoiding concentrated exposure to noise, fumes, odors, dust, gases, poor ventilation, and hazards such as machinery and heights. R. at 84-85. Totin found moderate limitations in ability to carry out detailed instructions, to perform and maintain a schedule, to understand and remember detailed instructions, to work in proximity to other people, to complete a normal workday or workweek without interruptions from psychologically based symptoms, and to perform at a consisted pace without an unreasonable number and length of rest periods. R. at 85-86. Totin diagnosed Plaintiff with severe degenerative back disorder, severe somatoform disorder, and severe migraines. R. at 82. Totin finally concluded that the impairments could reasonably be expected to produce the symptoms complained of and found Plaintiff's statements to be substantiated by objective medical evidence. R. at 83.

**C. Hearing Testimony**

*1. Plaintiff's Testimony*

At the hearing, when questioned by the ALJ, Plaintiff discussed her facial and cervical back pain. R. at 47-48. Plaintiff explained that she is left-handed, and pain in her left shoulder and left side caused her to drop things. R. at 39. Plaintiff also testified that she passed out while driving several months before the hearing. Id. Plaintiff stated she had five similar syncope-related episodes since March 2014. R. at 39-40. These incidents included syncope attacks while eating cereal, near a furnace, while driving, and in the bathroom. R. at 53. Plaintiff described herself as incoherent and unable to stand up after the attacks. R. at 54.

Plaintiff discussed reasons for absences from MetLife, including blood pressure issues in May 2013 and panic attacks on July 3, 2013. R. at 45. The ALJ asked about Plaintiff's diagnosis of trigeminal neuralgia and Plaintiff explained that one doctor did not believe in trigeminal neuralgia and had diagnosed her with facial pain. R. at 47. Plaintiff clarified that other neurologists had diagnosed her with "atypical Type II" trigeminal neuralgia. R. at 47-48.

Under questioning by the ALJ, Plaintiff testified that her trigeminal neuralgia attacks came suddenly and then stayed continuously. R. at 48. Plaintiff described that the pain could stay for as little as one day to as long as three weeks. Id. Plaintiff explained that the attacks reached a pain level of ten or ten out of ten every couple of weeks. R. at 51. Plaintiff testified that the symptoms were exacerbated by driving in a car, wind from open windows, air conditioning, talking loudly, weather changes, humidity, season changes, and stress. R. at 48-50. Plaintiff also stated that she is currently never asymptomatic, and that even the pain medication no longer helped. R. at 49. Plaintiff told the ALJ that she discussed possible surgery with her physicians, but was informed it had a lower success rate for type II trigeminal neuralgia. R at 48.

In terms of medication, the Plaintiff reported to the ALJ that she is currently on narcotic pain medication, and also mentioned several drugs by name: neurontin, Tegretol, citalopram, and Xanax. R. at 50-51. In response to questions concerning side effects, Plaintiff stated the drugs created memory loss, confusion, and trouble paying attention. R. at 50. Plaintiff noted that the side effects were appreciable enough to be noticed by her children. Id.

Plaintiff testified that her typical day, prior to June 3, 2014, consisted of watching TV, talking to her husband, and talking to her dog. R. at 52. Plaintiff stated that she became decreasingly active with the community and lost contact with most friends around this time. Id.

15

Plaintiff's separate symptoms, when queried by the ALJ, included a neck ache that went into the bottom of her skull and radiated into her left shoulder. R. at 55-56. Plaintiff complained of difficulty turning her neck all the way. R. at 55. Plaintiff further stated she had to use a TENS unit three times a day. R. at 55-56.

When questioned by her attorney, Plaintiff discussed issues with sleep, including an irregular sleep schedule. R. at 58-59. Plaintiff stated that she is seeing a sleep study specialist. Id. Plaintiff testified that on a "good day," her pain level was between five out of ten and six out of ten. R at, 60. Currently, Plaintiff said there is never a day when all the pain is gone. Id.

Plaintiff also testified that every few weeks she has uncontrollable panic attacks, cries for prolonged periods of time, and becomes agitated and antsy. R. at 61-62. In response, Plaintiff stated she now takes her prescribed Xanax more frequently. R. at 61. In terms of factors affecting her trigeminal neuralgia, Plaintiff added that wearing her glasses could exacerbate her symptoms. R. at 60. The list of Plaintiff's daily activities was expanded to attempting to read, listening to relaxing music, or walking to the nearby lake. R. at 58. Plaintiff clarified that she had trouble reading because of her concentration issues. R. at 60.

Plaintiff testified that presently she sometimes does not get dressed, shower, or wash her hair. R. at 57. Plaintiff stated that her husband generally takes care of the housework, including all the vacuuming. R. at 56-57. Additionally, Plaintiff's husband does all the cooking, although Plaintiff admitted that she occasionally makes toast. R at. 57. Plaintiff informed her attorney that while she accompanies her husband to the grocery store, she usually just leans on the cart while he pushes the cart, buys the food, and puts the groceries away. Id.

## 2. Vocational Expert Testimony

The ALJ also sought the opinion of vocational expert ("VE ") Karen Simone.  R. at 63.  VE

Simone was asked to consider an individual closely approaching advanced age with a high school

education, as well as Plaintiff's past work experience and  RFC.  R. at 67.

The ALJ further extended the question to include the hypothetical:

> [T]o assume that the individual who could stand and walk for a total of
> and six hours out of an eight-hour workday, sit for a total of about six
> hours out of an eight-hour workday, lift and carry, push and pull 20
> pounds occasionally, and 10 pounds frequently,  who should avoid work
> at heights, around dangerous machinery or vocational driving.  No more
> than occasional verbal communications, avoid exposure to temperature
> below 65 degrees Fahrenheit [which would] make it inside work.
> Assume that the individual could understand, remember and carry out
> simple instructions, the individual could perform simple tasks . . . limited
> to relatively unchanging tasks, no more than occasional decision-making,
> no negotiation [or] responsibility for the safety of others or fast-paced
> production rates.

R. at 67-68.  VE Simone testified that an individual with the RFC and limitations posed in the

hypothetical would not be able to perform any of Plaintiff's past jobs because they exceeded simple

tasks or simple instruction; they required decision-making, they were not routine, and included

responsibility for other individuals.  R. at 68.  VE Simone identified unskilled work such as a mail

clerk, cafeteria attendant, and retail marker as work that an individual with the limitations in the

hypothetical could perform.  R. at 69.  Additionally, VE Simone opined that such an individual was

limited to taking ten to fifteen percent of a workday off and that "anything greater than one absence a

month would absolutely lead to somebody's termination."  R. at 70.

**D. ALJ Decision**

In a decision dated October 8, 2014, ALJ Flanagan ("ALJ") denied Plaintiff's claim finding her "not disabled." R. at 18-27. At step one, the ALJ found that Plaintiff had not performed substantial gainful activity during the period from the alleged onset of her disability on January 28, 2013. R. at 20. At steps two and three, Plaintiff's hypertension and connective tissue disorder were found to be not severe. R. at 22. Plaintiff's trigeminal neuralgia, degenerative disc disease of the cervical spine, syncope of an unknown etiology, depression, and anxiety were deemed "severe" impairments, but found that these impairments did not meet or medically equal the criteria for a listed impairment. R. at 20-22.

The ALJ followed 20 C.F.R. § 404.1520a to evaluate Plaintiff's mental impairments and relied heavily on Dr. Santoro's records to determine the extent of Plaintiff's daily living, social function, concentration, persistence, or pace, and episodes of decompensation. R. at 21, 408. In doing so, Plaintiff was found to have mild restrictions in performing activities of daily living, in maintaining concentration, in persistence or pace, and had no episodes of decompensation. R. at 22. Additionally, the ALJ concluded that the medical evidence did not establish the presence of any "B" or "C criteria." Id. Furthermore, Plaintiff was determined not to have an impairment or combination of impairments that meets the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. Id.

Plaintiff was found to have the residual functional capacity ("RFC") to stand and walk a total of six hours out of an eight-hour workday, to sit for a total of about six hours out of an eight-hour workday, and to lift, carry, and push and pull twenty pounds occasionally and ten pounds frequently. R. at 23. ALJ Flanagan further found that Plaintiff was able to understand, remember, and carry out

18

simple instructions and perform simple tasks.  Id.  The ALJ ruled that Plaintiff's capacity was limited to relatively unchanging tasks, with no more than occasional decision making, and no negotiating involved.  Id.  Further, it was ruled that Plaintiff should have no responsibility for the safety of others or fast-paced production rates.  Id.  Additionally, restrictions included Plaintiff being limited to no more than occasional verbal communication, avoiding exposure to temperatures below sixty-five degrees Fahrenheit.  Id.

In reaching this conclusion, only limited weight was allocated to Plaintiff's treating physicians, Dr. Bulawa and Dr. Francis.  R. at 24.  The ALJ discounted Dr. Bulawa's opinion that Plaintiff should not work based on that the rest of Plaintiff's "physical examination was unremarkable" during the same visitation.  Id.  Another of Plaintiff's treating physician Desmond Francis, M.D. ("Dr. Francis"), who outlined limitations to Plaintiff sitting, walking, and standing was given less than controlling weight by the ALJ based on comparison to Dr. Jacob's and Dr. Herard's notes.  Id.  Dr. Jacob described that Plaintiff had  "normal gait, [full] range of motion . . . in the neck, no obvious deformity, facet tenderness, or trigger points . . . present along the cervical spine . . ." and Dr. Herald noted that Plaintiff had "normal gait, normal motor strength in her extremities, no pronator drift, normal deep tendon reflexes, normal coordination, and normal sensation . . ." and references in his notes that Plaintiff categorized her pain as a two out of a maximum ten during the visitation.  Id.  The ALJ determined that Dr. Herald's and Dr. Jacob's notes contradicted Dr. Francis's limitations.  Id.  Emphasis was placed on numerous unremarkable or normal physical examinations.  Id.  The decision relied heavily on diagnostic images including an image of the brain that was deemed "unremarkable," an MRI showing that the cervical spine had not worsened, and a sonographic evaluation that showed "no evidence of significant flow restriction."  Id.

Dr. Cumming's opinion that Plaintiff's history was inconsistent with "classic" trigeminal neuralgia was also highlighted by ALJ Flanagan. Id. The ALJ pointed out that Plaintiff was relatively pain free in May 2013 with the use of pain medication. Id. Portions of the Record were noted by the ALJ where Plaintiff tried to taper off medication. Id. Emphasis was given to the fact that Plaintiff's trigeminal neuralgia was in remission in December 2013. Id. The ALJ also claimed Plaintiff was "headache free" during physical therapy. Id.

Overall, ALJ Flanagan concluded that the diagnostic images and medical evidence undermined Dr. Bulawa's and Dr. Francis's opinion. Id. Some weight was afforded to Dr. Francis's opinion concerning Plaintiff's syncope, despite ALJ Flanagan's hesitation, because of "limited documented episodes." R. at 25. Dr. Francis's opinion concerning syncope was incorporated into the RFC by adding limitations concerning heights, dangerous machinery, and vocational driving. Id.

In terms of mental limitations, the ALJ relied on Dr. Santoro's assessment in order to include mild limitations on understanding simple instructions and directions, maintaining attention and concentration, learning new tasks, performing complex tasks, making appropriate decisions, relating adequately with others, and dealing with stress, along with moderate limitation for maintaining a regular schedule. R. at 25. The ALJ expanded the limitation to the Plaintiff doing only simple work that entails unchanging tasks, no more than occasional decision making, and no negotiation, confrontation, or responsibility for the safety of others or fast-paced production rate tasks. Id. Nonetheless, the ALJ declined to give "greater weight" to Dr. Santoro's comments concerning Plaintiff's limitations on activities of daily living because the ALJ claimed "that the limitations [Dr. Santoro] used are not defined." R. at 25, 411-12.

The state agency medical consultant M. Totin indicated that Plaintiff has the mental RFC to engage in substantial gainful activity.  Id.  However, the ALJ claimed he only allocated limited evidentiary weight to the opinion because it was "vague and not a function-by-function assessment." Id.

Dr. Sharpe and LCSW-R Charlene Emeterio both opined that Plaintiff was unable to work. Id.  Ms. Emeterio and Dr. Sharpe, who was erroneously described as an NPP, were allocated limited weight because they are not acceptable medical sources under the Regulations and were further contradicted by objective evidence in the record.  Id.

The ALJ stated that he found Plaintiff's subjective complaints to not be fully credible because they were contradicted by the normal physical examinations in the Record, including the fact that her trigeminal neuralgia,  headaches, and cervical pain improved with conservative care; the mental status examination in the Record; and the broad range of her daily activities.  R. at 26.  The ALJ implied that Plaintiff "attempted to minimize her activity levels while applying for disability benefits."  Id.  One medical record from January 2014 was specifically referenced by the ALJ where Plaintiff "described herself as an active individual with independent activities of daily living."  Id.

At step four, Plaintiff was unable to perform any past relevant work as it exceeds her RFC. R. at 26.  For step five—in light of Plaintiff's age, education, and work history—under the framework set forth in the Medical-Vocational Guidelines, the ALJ found that Plaintiff remained capable of performing work that existed in significant numbers in the national economy, such as employment a mail clerk, cafeteria attendant, or retail marker.  R. at 27.  In reaching these conclusions, the ALJ relied solely on VE Simone's testimony in reply to the hypothetical question

concerning light work.  Id.  Accordingly, the ALJ concluded that Plaintiff was not disabled under

sections 216(i) and 213(d) of the Social Security Act.  Id.

## III. LEGAL STANDARD

### A. Standard of Review

When a court reviews an ALJ's final decision, it must determine whether the ALJ applied the

correct legal standards and whether the decision is supported by substantial evidence in the record.

42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).  Substantial evidence amounts to "more than

a mere scintilla," and it must reasonably support the decision-maker's conclusion.  Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it

might justifiably have reached a different result upon a de novo review."  Sixberry v. Colvin, No. 12-

CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health &

Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  However, the Court should not uphold the

ALJ's decision when there is substantial evidence to support the decision, but it is not clear that the

ALJ applied the correct legal standards.  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

Additionally, "[a]s deferential as the 'substantial evidence' standard is, it is also extremely flexible.

It gives federal courts the freedom to take a case-specific, comprehensive view of the administrative

proceedings, weighing all the evidence to determine whether it was 'substantial.'"  Brault v. Soc.

Sec. Admin., Comm'r, 683 F.3d 443, 449 (2d Cir. 2012).

**B. Standard for Benefits**

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. Part 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. §404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to

review the claimant's RFC and past relevant work.  Id. § 404.1520(a)(4)(iv).  The claimant is not

disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work.

Id.  If the claimant cannot perform his past relevant work, the SSA decides at step five whether

adjustments can be made to allow the claimant to work somewhere in a different capacity.  Id. §

404.1520(a)(4)(v).  If appropriate work does not exist, then the SSA considers the claimant to be

disabled.  Id.

## IV.    DISCUSSION

Plaintiff argues that the ALJ erred by: (1) not supporting the RFC with substantial evidence,

including failing to afford controlling weight to Plaintiff's treating physicians, failing to properly

weigh the opinion of consultative examiner Dr. Santoro, and failing to fully and fairly develop the

record; (2) failing to properly evaluate the credibility of Plaintiff's testimony; and (3) reaching a Step

Five determination that was not supported by substantial evidence.  Pl.'s Br. at 12-22.

### A.  The RFC

#### 1.  Plaintiff's Treating Physicians

Plaintiff alleged that the ALJ erred by not affording controlling weight to Plaintiff's treating

physicians, Dr. Bulawa and Dr. Francis.  Pl.'s Br. at 12.  To support this assertion, Plaintiff argued

that the ALJ pointed to less severe evidence but ignored other evidence from the same source without

articulating the reason.  Id. at 12, 14.  Plaintiff stated that the ALJ also afforded too much weight to a

non-treating physician whom Plaintiff only visited once.  Id. at 14.  Plaintiff further contended that

the diagnostic images of record relied on by the ALJ do not undermine the treating physicians'

opinions.  Id.  Finally, Plaintiff's contended that the ALJ neglected to consider relevant factors

pursuant to 20 C.F.R § 404.1527(c)(2) and SSR 96-2p when he weighed Dr. Bulawa's and Dr. Francis's opinions.  Pl's Br. at 16-17; SSR 96-2P 1996 WL 374188 (S.S.A. July 2, 1996).

Under the "treating physician rule," the general rule is that the opinion of a treating physician should be given controlling weight as long as it is consistent with other substantial evidence and is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1527(c)(2); accord Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).  An ALJ must consider the treating physician's opinion and provide good reason for rejecting a treating physician's opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Melillo v. Astrue, No. 06-CV-0698, 2009 WL 1559825, at *12 (N.D.N.Y. June 3, 2009) (Kahn, J) (citing Johnson, 817 F.2d at 985-86).  A singular visit to a physician that is inconsistent with consistent accounts of the severity and persistence of symptoms should be accorded minimal weight.  Sickles v. Colvin, No. 12-CV-774, 2014 WL 795978, at *9 (N.D.N.Y. Feb. 27, 2014).

While the Court agrees that medical evidence with multiple rational interpretations does not preclude an ALJ's decision being affirmed, the substantial evidence must still reasonably support the decision-maker's conclusion.  Halloran, 362 F.3d 28, 31 (2d Cir. 2004).  The Federal courts will generally remand a case where the "substance of the treating physician rule was not traversed," but nonetheless affirm cases where the ALJ acknowledged the treating physician rule and concluded that the treating physician was contradicted thoroughout the records.  Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (quoting Halloran, 362 F.3d at 32-33) (affirming where the ALJ specifically acknowledged the treating physician rule and noted that the treating physician was contradicted by the findings of every other physician on the record).

Further, it is an error to conclude a plaintiff is not disabled merely by attaching significance to an omission, an absence, or a treating physician's failure to report a symptom in the medical record. see Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (remanding where ALJ was not in a position to determine whether the absence of muscle spasms indicated a lack of disabling loss of motion, which would preclude a finding of disability). Moreover, an ALJ "may not arbitrarily substitute his/her own judgment for competent medical opinion." Kikta v. Comm'r of Soc. Sec., No. 15-CV-60, 2016 WL 825259, at *5 (N.D.N.Y. Feb. 9, 2016).

Here, ALJ Flanagan did not acknowledge the treating physician rule but did acknowledge that Dr. Bulawa and Dr. Francis are Plaintiff's treating physicians. R. at 23. The ALJ directly discussed Dr. Bulawa only once in his explanation of why he discounted the treating physicians' opinions. R. at 24. Dr. Bulawa was discounted by the ALJ because "[r]heumatology records also indicated that the claimant denied experiencing any seizure-related symptoms . . . and while Dr. Bulawa advised the claimant to remain out of work, he noted that her physical examination was normal." R. at 24. The ALJ specifically referred to a page in the medical record that does not substantially support the ALJ's assessment. During the physical examination in question, Dr. Bulawa noted Plaintiff appeared "unwell, weak, uncomfortable and worried." R. at 490. Additionally, Dr. Bulawa referred to Plaintiff's headaches as "continu[ing] to be a problem" and noted that Plaintiff's narcotic pain medication interfered with Plaintiff's sleep. Id.

The ALJ provided a more thorough analysis of inconsistencies concerning the limitations described by Dr. Francis. R. at 24. The ALJ placed great emphasis on one-time visitations with Dr. Herard and Dr. Cummings. Id. Not only is ALJ Flanagan's emphasis on the one-time visitations erroneous, but the ALJ focused on portions of Dr. Herard's and Dr. Cummings's medical records that

were not substantially supported.  Notably, the ALJ highlighted Dr. Cummings's statement that Plaintiff's history was "not consistent with *classic* trigeminal neuralgia,"  R. at 689 (emphasis added); however, multiple physicians, including Dr. Deshaies, Dr. Dreiner, Dr. Herard, Dr. Docous, Dr. Francis, Dr. Bulawa, and neurologist Dr. Jacob, diagnosed Plaintiff with trigeminal neuralgia, or "*atypical* type II trigeminal neuralgia,"  R. at 314, 688, (emphasis added) throughout the Record, R. at 293, 318, 330-31, 528, 532.   Additionally, while Plaintiff admitted to Dr. Herard that she was in less pain with narcotic pain medication during March 2013, the Record is replete with complaints of pain, including complaints of facial pain later that very month.  R. at 262, 302, 304-06, 312-17, 330, 345-47, 370, 387, 488-91, 528-33, 606-09, 625-26, 629-30, 670-78, 688-90, 699-702, 732. Therefore, unlike in Kennedy, Plaintiff's treating physicians are supported, not contradicted, by a majority of the physicians in the record.  Kennedy, 343 F. App'x at 721.  Additionally, Plaintiff's testimony and reports to physicians throughout the Record clearly indicated that the severity of Plaintiff's trigeminal neuralgia pain fluctuated, which the ALJ did not account for when he focused solely on the few one-time visitations to non-treating physicians where Plaintiff was not in severe pain.  R. at 24; see also R. at 48, 51, 58-59, 317, 530-31, 688-89.

The Court further finds that the diagnostic images and medical record do not undermine the treating physicians' opinions of cervicalgia and trigeminal neuralgia because the ALJ overstepped his authority by concluding that the images were inconsistent with other substantial evidence on the Record.  The ALJ supported his decision that the treating physicians' opinions were inconsistent and unsupported by placing considerable evidence on diagnostic images, R. at 24, including images of Plaintiff's brain that were deemed "unremarkable," R. at 260, 269, 620, an MRI scan of Plaintiff's cervical disorder supporting a conclusion that "significant degenerative change is stable as compared

27

with the prior study," R. at 711-13, and a Plaintiff's sonographic evaluation of carotid systems that showed "no evidence of significant flow restriction," R. at 716. Notably, the ALJ placed heavy weight on the absence of certain medical symptoms that would have supported Dr. Francis's and Dr. Bulawa's opinions, including his own interpretation of the MRI note, asserting that it meant Plaintiff's degenerative disc disease of the cervical spine was "generally stable." R. at 24. However, the ALJ ignored abnormalities that appeared in the same MRI, and he failed to mention that the diagnostic images clearly noted the "poor image quality of the current study." R. at 711. Overall, the Court finds that the ALJ cannot interpret a lack of evidence of significant flow restriction and unremarkable brain scans as an absence of symptoms that in turn precludes a finding of disability, particularly when Plaintiff's diagnoses of cervicalgia and trigeminal neuralgia are well noted throughout the Record.

Similarly, extending this analysis beyond diagnostic images, the ALJ dismissed Dr. Francis's limitations to sitting, standing, and walking by pointing to Dr. Jacob's notes of "normal gait, normal motor strength, no pronator drift, normal deep tendon reflexes, normal coordination and normal sensation," and Dr. Herard's notes of "normal gait, range of motion . . . full in the neck, no obvious deformity, facet tenderness, or trigger points present along the cervical spines, muscle strength . . . full in the upper extremities." R. at 24. Notably, Dr. Francis's limitations were in response to trigeminal neuralgia and therefore the absence of certain physical symptoms, such as "pronator drift," was improperly interpreted by the ALJ to preclude Plaintiff's treating physicians from being given controlling weight. R. at 306, 706.

Accordingly, the ALJ erroneously relied on his own interpretation of the diagnosistic images and the absence of certain symptoms to reach the conclusion that there were inconsistencies in the

Record that precluded a finding of disability. Further, the Court finds it improper that Plaintiff's treating physicians, Dr. Bulawa and Dr. Francis were not given controlling weight without a sufficient explanation.

Defendant argues that further analysis under 20 C.F.R § 404.152(c)(2) and SSR 96-2p was unnecessary. Def.'s Br. 13. Defendant relies on the ALJ's discussion of unsupported and inconsistent medical advice to excuse the lack of analysis, since "the ALJ's reasoning and adherence to the regulations are already abundantly clear." Def.'s Br. 13 (citing Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013)).

The Court finds Defendant's argument unavailing, as ALJ Flanagan failed to adhere to the appropriate standards throughout his decision. Generally, when the treating physician is not given controlling weight, an ALJ "must" consider the following factors in determining the appropriate weight to assign the opinions:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; (5) the degree to which the physician specialized in the area in which he or she rendered an opion; and (vi) other relevent factors.

Lewis v. Apfel, 62 F. Supp. 2d 648, 656-57 (N.D.N.Y. 1999) (Kahn, J.). An ALJ must give "good reasons" for the weight accorded to the treating physician's opinion in every case. Id. at 657.

It is undisputed that the ALJ failed to consider the length of the treatment relationship, the frequency of examination, or the nature and extent of the treatment relationship. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); Pl.'s Br. at 16; Def.'s Br. at 13. Unlike in Atwater, the Court does not find the ALJ's reasoning and adherence to the regulations "abundantly clear" in dismissing the treating physicians' express limitations. Atwater, 512 F. App'x at 70. Accordingly, the ALJ's decision must

29

be remanded to consider the first two factors in assigning appropriate weight to the treating physicians' opinions.

### 2. Weight of Consultative Examiner

Plaintiff alleged that the ALJ failed to properly weigh the opinion of the consultative examiner, Dr. Santoro, and failed to properly analyze the opinion evidence in the record. Pl.'s Br. at 17, 19. Plaintiff particularly focuses on the exclusion of Dr. Santoro's opinion of Plaintiff's ability to manage funds, and that the examination "appeared to be consistent with psychiatric problems that may significantly interfere with Plaintiff's ability to function on a daily basis . . . ." Pl.'s Br. at 18; see also R. at 411-12.

The Second Circuit has held that in addition to the typical five-step analysis outlined in 20 C.F.R. § 404.1520a, the ALJ must apply a "special technique" at the second and third steps to evaluate alleged mental impairments. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). For an ALJ to determine whether a claimant has a medically determinable mental impairment, at the second and third step the SSA regulations require an assessment of the degree of functional limitations resulting from the impairment in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 405.1520a(c)(3).

The degree of limitation is rated on a five-point scale including none, mild, moderate, marked, and extreme. Leonard v. Colvin, No. 15-CV-0125, 2016 WL 1237782, at *15 (N.D.N.Y. Mar. 2, 2016). An ALJ's written decision "must include a specific finding as to the degree of limitation in each of the functional areas . . . ." Id. It is insufficient to use "coincidental discussion" of the four broad areas to satisfy 20 C.F.R. § 405.1520a. Jenkins v. Comm'r of Soc. Sec., 769 F.

Supp. 2d 157, 160 (W.D.N.Y. 2011) (citing Kohler, 546 F.3d at 268-69).  Instead, an ALJ "must

show the significant history, including examination and laboratory findings, and the functional

limitations that were considered in reaching a conclusion about the severity of the mental

impairment(s)."  20 C.F.R. § 404.1520a(e)(4).  An ALJ's failure to apply the special technique

cannot be construed as harmless when a court cannot "identify findings regarding the degree of [a

claimant's] limitations in each of the four functional areas nor discern whether the ALJ properly

considered all evidence relevant to those areas."  Jenkins, 769 F. Supp 2d at 162.  Additionally, brief

elaborations and reliance on one-time consultative evaluations do not constitute adequate

explanations of the four factors.  Buford v. Comm'r of Soc. Sec., No. 12-CV-5751, 2015 WL

8042210, at *17 (E.D.N.Y. Dec. 3, 2015).

     The Court finds that although the ALJ came to the conclusion that Plaintiff's depression and

anxiety were "severe," the ALJ lacked specificity in his assessment of the four broad areas of

functional limitations.  R. at 21-22.  The ALJ noted mild restrictions in performing activities of daily

living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining

concentration, persistence or pace; and no episodes of decompensation.  R. at 21.  The ALJ's cursory

explanation focused solely on select parts of Dr. Santoro's intake with Plaintiff, ignoring that

Plaintiff reported struggling with daily activities, Dr. Santoro's findings that Plaintiff's mental issues

"appear to be consistent with psychiatric problems that may significant[ly] interfere with [Plaintiff's]

ability to function on a daily basis," and Dr. Santoro's defined limitation of Plaintiff's inability to

manage funds.  R. at 411.

     Plaintiff argues that the ALJ did not assign Dr. Santoro proper weight.  Pl.'s Br. at 17-18. The

ALJ erred by relying excessively on select portions of Plaintiff's one-time visit with the consultative

evaluator. The ALJ did not properly consider the objective evidence, including corroborating evidence by LCSW-R Emerterio, Dr. Sharpe, and Plaintiff's testimony that supported Dr. Santoro's assessment of Plaintiff's ability to function on a daily basis. R. at 21-22, 25, 655-57, 704. Additionally, ALJ Flanagan's stated reason to not afford further weight was that Dr. Santoro's limitations were "undefined." R. at 25. Even by the ALJ's own reasoning, he erred by not adding in to the hypothetical the limitation that Dr. Santoro had clearly defined: Plaintiff's inability to manage money. R. at 412. Therefore, the Court finds the ALJ improperly weighed the consultative examiner's opinion by disregarding Dr. Santoro's defined limitations and her opinion that corroborated other evidence in the Record.

### 3. Development of the Record

The SSA must develop a claimant's complete medical history for a least the twelve months preceding the month in which the claimant filed the application and, if the evidence of record is insufficient to determine whether the claimant is disabled, may recontact the treating physician. 20 C.F.R. §§ 404.1512(d); 404.1520(c)(1). An ALJ has an affirmative duty, even when a client is represented by counsel, to "develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009)). However, where "there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing Perez, 77 F.3d at 48). Additionally, the Regulations discuss recontacting a claimant's treating sources; however, there is no requirement that an ALJ recontact a consultative

examiner for clarification.  Gruka v. Colvin, No. 14-CV-795S, 2015 WL 9478242, at *5 (W.D.N.Y. Dec. 29, 2015).

The Court rejects Plaintiff's assertion that the ALJ's failure to recontact a consultative examiner to clarify "undefined" limitations constituted a failure to fully and fairly develop the record. Pl.'s Br. at 18-19.  The ALJ had Plaintiff's complete medical records at the time of the decision.  The only documentation indicated to be missing during the testimony concerned medical evidence relating to seizures, which was not relevant in the ALJ's assessment of Dr. Santoro's opinion.  R. at 70.  Additionally, Dr. Santoro is a consultative examiner, not Plaintiff's treating source.  Therefore, the Court finds that the ALJ had no duty to recontact Dr. Santoro, and affirms that the ALJ fully and fairly developed the record.

**B. Credibility**

The ALJ determined that Plaintiff's subjective complaints were "not fully credible" and "suggests that she attempted to minimize her activity levels while applying for disability benefits." R. at 26.  In evaluating the credibility of Plaintiff's testimony, the ALJ considered Plaintiff's multiple "normal" physical and mental examinations, noted that Plaintiff's trigeminal neuralgia, headaches, and cervical pain improved with conservative care, and placed emphasis on her broad range of daily activities.  Id.

An ALJ is instructed to carefully consider a claimant's individual statements regarding symptoms with the rest of the evidence in the record in order to reach a conclusion about the credibility of a claimant's statements if a disability determination cannot be made solely on the basis of objective medical evidence.  SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).  A plaintiff's allegation of pain, when supported by objective medical evidence, is "entitled to great

weight." Rockwood v. Astrue, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009). A claimant's testimony

as to subjective pain may still serve as a basis for establishing disability, even if it is not fully

supported by objective medical evidence. Norman v. Astrue, 912 F. Supp. 2d 33, 43 (S.D.N.Y.

2012) (quoting Simmons v. U.S.R.R. Retirement Bd., 982 F.2d 49, 56 (2d. Cir. 1992)).

First, the ALJ must determine whether the claimant has medically determinable impairments

that could "reasonably be expected to produce the pain or other symptoms alleged." Rockwood, 614

F. Supp. 2d at 271 (quoting 20 C.F.R. § 404.1529(a)). Second, if medically determinable

impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of

the symptoms to determine the extent to which they limit the claimant's capacity to work. Id. When

an ALJ's adverse credibility findings are "based on a misreading of the evidence, it [does] not

comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence' and

cannot stand." Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010) (citation omitted) (quoting 20 C.F.R.

§ 404.1545(a)(3)) (remanding where the plaintiff's self-description in medical records were

erroneously stated in the decision, and therefore the plaintiff's testimony appeared inconsistent).

Since symptoms sometimes suggest a greater severity of impairment than can be shown by

objective medical evidence alone, an ALJ is required to consider the following factors in assessing a

claimant's credibility:

> (1) the claimant's daily activities; (2) the location, duration, frequency,
> and intensity of symptoms; (3) precipitating and aggravating factors;
> (4) type, dosage, effectiveness, and side effects of any medication;
> (5) other treatment received; (6) other measures taken to relieve
> symptoms; and (7) any other factors concerning the individuals functional
> limitations and restrictions due to pain or other symptoms.

Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010). Notably, the issue is "not whether the

clinical and objective findings are consistent with an inability to perform all substantial activity, but

whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain are consistent with the objective medical and other evidence." Id.

Although a remand is not necessary in "every case where there are not explicit findings on all seven of the required factors," a remand may be required where the ALJ's written opinion indicates that "only one or two of the seven factors . . . was given any consideration before drawing an adverse credibility determination" against the plaintiff. Sarchese v. Barnhart, No. 01-CV-2172, 2002 WL 1732802, at *9 (E.D.N.Y. July 19, 2002). Even when the objective medical evidence and factors are fully reviewed, remand is appropriate if the ALJ does not explain his decision "explicitly and with sufficient specificity" to determine "whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." Norman, 912 F. Supp. 2d at 43 (quoting Urena-Perez v. Astrue., 2009 WL 1726217, at *40).

ALJ Flanagan did not explain his reasons explicitly and with sufficient specificity. Instead he broadly stated that he found Plaintiff's allegations contradicted by "normal physical examinations in record, the fact her trigeminal neuralgia, headaches, and cervical pain improved with conservative care, the normal mental status examinations in record and [Plaintiff's] broad range of activities of daily living." R. at 26.

First, the ALJ ignored Plaintiff's testimony concerning the duration and frequency of her pain symptoms, which, according to Plaintiff's testimony, present as attacks that last several days, and reach a pain level of nine out of ten or ten out of ten in severity every couple of weeks. R. at 48-49, 51, 59-60. Concerning Plaintiff's trigeminal neuralgia pain, the ALJ placed emphasis on a one-time visit to Dr. Herard on March 7, 2013, where Plaintiff stated a general decrease of pain from ten out of ten to two out of ten. R. at 533. The ALJ deemed irrelevant Plaintiff's complaints of chest pains,

joint pains, headaches, and unsteadiness that appeared in the same notes. R. at 530-33. Plaintiff further expressed cold intolerance and described her pain as ten out of ten at its worst, and bad enough to wake her up at night. R. at 530. The ALJ also neglected to mention that Dr. Herard diagnosed Plaintiff with trigeminal neuralgia, TMJ syndrome, and cervicalgia, and that Dr. Herard suggested surgery as a possible treatment. R. at 533. While the ALJ correctly noted that there are periods, such as in September 2013, when Plaintiff's pain worsened, he focused his analysis on a March 2013 visit to Dr. Herard, a May 2013 visit where Plaintiff was tapering off pain medication, and a few October 2013 physical therapy appointments where Plaintiff was "headache free." R. at 24, 26. The medical record, however, was replete with reports of pain symptoms from January 2013 through January 2014, particularly concerning Plaintiff's face, jaw, and neck pain. R. at 262, 280, 302, 304-06, 312-14, 330, 345-47, 370, 387, 488-91, 528, 532, 590, 606-09, 625-26, 629-30, 670-78, 699-702, 732. Plaintiff further reported symptoms of dizziness, anxiety, and depression from May 2013 through January 2014. R. at 335-37, 339-41, 345-47, 408-12, 655-57, 704, 721, 727-28. Substantial evidence showed that Plaintiff reported pain during the same months, although not on the same dates, which the ALJ referred to as inconsistent because of reports of "doing well" or being "headache free." R. at 24. For example, the ALJ pointed to May 2013, when Plaintiff's medical records indicated that Plaintiff was pain free and "doing well" but ignored that, during the same visitation, Plaintiff reported two episodes of facial pain that occurred only a week prior. R. at 301-05. Additionally, the ALJ's broad statement that Plaintiff was "headache free" during physical therapy was corrected in Plaintiff's medical record where Plaintiff complained at her followup visitation about a headache after the October 14, 2013 visitation and during her October 16, 2013 physical therapy appointment. R. at 699-702.

The ALJ's only specific example of Plaintiff's lack of credibility was based on a misreading of the Record. R. at 26. The ALJ highlighted that Plaintiff "described herself as an active individual with independent activities of daily living." R. at 26. The statement was authored by Dr. Rajiv Patel during an emergency room visit, which contains the vague statement "the patient otherwise is an active individual." Id. The ALJ's additions to the Record show that the ALJ fundamentally misunderstood Plaintiff's reports in the medical record. R. at 24, 26, 408-12, 590. The ALJ's misunderstanding particularly affected the ALJ's analysis of Plaintiff's ability to perform daily activities, where he ignored Plaintiff's testimony that was corroborated by the objective medical evidence, including Dr. Santoro's medical records. R. at 52, 56-58, 331, 408-12, 692, 704-06.

The ALJ further failed to address several pertinent factors concerning Plaintiff's severe impairments, notably the duration, frequency, and intensity of Plaintiff's pain and the side effects of the medicine taken in order to improve her symptoms. The ALJ appears to have almost wholly based his credibility determination wholly on § 416.929(c)(3)(i) and only a portion of § 416.929(c)(3)(iv). R. at 23, 25-26.

Finally, the ALJ's discussion of 20 C.F.R. § 416.929(c)(3)(iv) concerning the side effects of Plaintiff's "multiple medications" consisted wholly of categorizing Plaintiff's treatment as "conservative care." R. at 26. In doing so, the ALJ completely ignored Plaintiff's testimony in response to the ALJ's own questioning regarding side effects. R. at 50. ALJ Flanagan also ignored Dr. Francis's specific references to multiple adverse side effects of the medication, including confusion, memory loss, and dizziness. R. at 706.

Accordingly, since the ALJ's decision only gives two factors out of the seven more than cursory review before drawing an overall adverse credibility determination against the Plaintiff, the

credibility assigned to Plaintiff's testimony is remanded for further analysis consistent with SSR 96-7p and the Record.

## C. Step Five

Plaintiff asserted that an ALJ is required to elicit useful testimony from a vocational expert and that the ALJ erred in relying on a hypothetical question that did not fully reflect the extent of the of Plaintiff's limitations. Pl.'s Br. at 22. VE Simone opined that, with the limitations in the hypothetical, a claimant could find a job such as cafeteria attendant, mail clerk, or retail marker. R. at 69. VE Simone stated that a claimant could only be unproductive for a total of ten to fifteen percent of a workday. R. at 70. Finally, VE Simone opined that anything greater than one absence a month would "absolutely lead to termination." Id.

First, the Court addresses Plaintiff's assertion that an ALJ is required to elicit useful testimony from the vocational expert. Pl.'s Br at 22. An ALJ's requirement to employ a vocational expert is narrowed to certain circumstances. See Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) (affirming that the existence of non-exertional impairment did not automatically require production of a vocational expert); see also Gravel v. Barnhart, 360 F. Supp. 2d 442, 448 (N.D.N.Y. 2005) (affirming that under SSR 83-12, the ALJ is not obliged to elicit testimony from a vocational expert when a claimant's RFC falls within the categories of the Grids).

Nevertheless, an ALJ may rely on vocational expert testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence and accurately reflect the limitations and capabilities of the claimant involved. McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014); see McAuliffe v. Barnhart, 571 F. Supp. 2d 400, 406 (W.D.N.Y. 2008) (remanding when the

ALJ relied on a vocational expert's response to a hypothetical that did not accurately portray claimant's impairments).

The ALJ's Step Five determination relied exclusively on VE Simone's answers to a hypothetical that was premised on "careful consideration of the entire record." R. at 23, 27. However, since the ALJ improperly discounted Plaintiff's credibility and improperly weighed Plaintiff's treating physicians, the hypothetical posed to VE Simone may not accurately reflect the limitations and capabilities of the Plaintiff. Therefore, the ALJ's Step Five determination must be remanded for reconsideration of additional limitations to the hypothetical, developed after revisiting Plaintiff's RFC and credibility.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED** for further proceedings consistent with this Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        July  01, 2016
              Albany, New York

Lawrence E. Kahn
U.S. District Judge